IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00898-MEH

JOSE MARTINEZ,

    Plaintiff,

v.

A2M4SEEN, LLLP,
d/b/a Workplace Resource,

    Defendant.

---

# ORDER
---

**Michael E. Hegarty, United States Magistrate Judge.**

    Before the Court is Defendant's Motion for Summary Judgment. ECF 22. The matter is fully briefed, and the Court finds that oral arguments will not materially assist in its adjudication. For the following reasons and based on the submitted record, the Motion is granted.

## BACKGROUND

### I.    Claims for Relief

    Defendant hired Plaintiff in April 2017 as an installation supervisor. In November 2018, he worked on an office installation project for a particular customer. That assignment resulted in Plaintiff receiving an adverse employment action. Plaintiff contends that Defendant terminated him on November 29, 2018. In the alternative, he argues that he suffered an adverse employment action when, on the day before, Defendant placed him on administrative leave without pay. Plaintiff alleges an unlawful motivation behind Defendant's action: discrimination on the basis of

his race and national origin. He raises employment discrimination claims under 42 U.S.C. §§ 1981 and 2000e.

## II.    Material Undisputed Facts

1. Defendant primarily sells office furniture and support services to commercial, higher education, government, and healthcare clients. ECF 1 at ¶ 14; ECF 12 at ¶ 14.

2. Defendant's installation supervisors are primarily Hispanic. ECF 22-1.

3. Throughout the time of Plaintiff's employment, Defendant had anti-discrimination policies and procedures in place related to employee conduct and discipline. ECF 22-2; ECF 22-3 at 4; ECF 22-4 at 5–6.

4. As a general matter, Defendant's approach to problem-solving is to encourage open discourse between customers, managers, and employees. ECF 22-2 at 12–14; ECF 22-4 at 6.

5. Defendant's policies and procedures are not rigid or formulaic but rather fluid and dependent on the circumstances. ECF 22-3 at 4.

6. Defendant has no standard procedure for setting meetings with employees. ECF 22-4 at 10. When Kate Kelly, Defendant's director of human resources, schedules a meeting, she usually sends a calendar invite to the employee. ECF 25-1 at 8.

7. Defendant's procedure for disciplining an employee generally starts with a conversation and/or a written warning, followed by a final written warning or termination. ECF 22-3 at 5; ECF 22-4 at 5.

8. For example, a former white/Caucasian employee, Mr. Schafer, was asked to bring in his equipment and meet with Defendant after making racial and religious slurs against a coworker. ECF 22-3 at 7–8. After meeting with Mr. Schafer, Rachel Clark (then vice-president of

operations), Rick Anunson (installation manager), and Ms. Kelly determined that the allegations were accurate. They decided to terminate his employment. *Id.* at 9.

9.     Ms.Clark, Mr. Anunson, and Ms. Kelly are white/Caucasian. ECF 25-1 at 3; ECF 25-4 at 3; ECF 25-5 at 3.

10.    Before this lawsuit, Mr. Anunson never had been accused of discrimination, nor had complaints been filed against him. ECF 22-5 at 4. Further, Ms. Kelly had never been accused of discrimination or the subject of any such complaints. ECF 22-4 at 4.

11.    Plaintiff identifies as Hispanic and is from Mexico. ECF 1 at ¶1; ECF 25-3 at 2.

12.    English is Plaintiff's second language. He understands English well but not perfectly. Usually, he can converse with customers, but at times, he asks for a bilingual coworker's help to ensure his correct understanding. ECF 25-2 at 5.

13.    Defendant hired Plaintiff in April 2017 as an installation supervisor. ECF 1 at ¶¶ 17–18; ECF 22-1.

14.    Plaintiff was qualified for the position. ECF 25-3 at 3. He worked as a furniture installer for over twenty-two years. ECF 25-2 at 3. He was an experienced and qualified furniture installer, and he had owned his own furniture installation company. ECF 25-3 at 3. No former employer or contractor ever had disciplined him, issued any warnings, or removed him from a job site. ECF 25-2 at 4.

15.    Plaintiff received a copy of the employee handbook and was familiar with the policies and procedures. ECF 22-6 at 6–7.

16.    At his deposition, Plaintiff explained his understanding of how Defendant handles a customer complaint about an employee: It consists of a follow-up with H.R. and the relevant

3

department manager and then an investigation, done on a case-by-case basis. Defendant informs the employee about the customer's complaint very quickly. *Id*. at 8–9.

17. Before the incident underlying this lawsuit, Defendant had received no complaints from customers about Plaintiff, nor had Defendant disciplined him. ECF 25-1 at 11. Mr. Anunson recalled no customer complaints about Plaintiff. Mr. Anunson added that Plaintiff performed to Defendant's expectations and got the job done. ECF 25-4 at 7.

18. Plaintiff's role as installation supervisor was "customer-facing." He was responsible for installing office equipment on-site to the customer's expectations. ECF 1 at ¶¶ 19, 27; ECF 22-6 at 4; ECF 22-7.

19. Plaintiff understood that in his role and industry, it is inappropriate to argue with a customer. "The customer should always be right." ECF 22-6 at 16.

20. Plaintiff's performance review for 2017 was favorable. It was the only review that Defendant did of him. ECF 25-8 at 22–23.

21. In September 2018, Defendant promoted longtime employee, Mr. Anunson, to the position of installation manager. That promotion made him Plaintiff's direct supervisor. ECF 1 at ¶ 25; ECF 22-5 at 5.

22. On or about September 28, 2018, an employee who worked for Defendant's sub-contractor aggressively confronted Plaintiff. ECF 22-5 at 14; ECF 22-8. After learning about the incident, Mr. Anunson emailed Ms. Kelly. ECF 22-8. To protect Plaintiff, Defendant barred that person from working on its projects. ECF 22-4 at 20; ECF 22-5 at 15–16.

23. Following its policy for investigating incidents, Defendant obtained a statement from Plaintiff to determine whether it needed to take additional steps to assist him. ECF 22-8. Ms. Kelly praised Plaintiff for keeping his composure during the confrontation and offered any needed

assistance. ECF 22-8 at 11. About a week later, Ms. Kelly emailed Plaintiff to ask how he was doing. ECF 22-8 at 13.

24. Plaintiff is pleased with how that incident was handled. He believes that Mr. Anunson and Defendant handled it correctly and favorably. ECF 22-6 at 3.

25. On November 9, 2018, Plaintiff started a project at the National Institute of Standards and Technology ("NIST"). ECF 22-6 at 12. Mr. Blalock was a NIST employee and the project's contact person. ECF 22-9 at 2, 6.

26. If a Defendant employee needed entry into a building other than the site of the installation work, a NIST employee would accompany him to provide access. ECF 25-7 at 3.

27. Mr. Gallegos was Defendant's project manager. On November 9, 2018, Plaintiff communicated with him about parts for the project. Mr. Gallegos instructed him to do what he could and to prepare a "punch list" of parts needed to complete the project. ECF 22-6 at 13; ECF 22-10 at 4. Site supervisors, such as the installation supervisor, are typically responsible for punch lists. ECF 1 at ¶ 31; ECF 22-11 at 4–5. It is never the customer's responsibility to create a punch list. ECF 22-5 at 6; ECF 22-6 at 16; ECF 22-11 at 4. Plaintiff did not complete a punch list on November 9, 2018. ECF 22-6 at 14.

28. On November 15, 2018, Plaintiff returned to NIST to finish the installation. ECF 22-6 at 15.

29. On November 16, 2018, Mr. Blalock emailed a list of missing parts to Mr. Gallegos and Mr. Adams (Defendant's account executive). ECF 22-12 at 2–3.

30. Mr. Gallegos told Mr. Adams about a conversation he had with Plaintiff. According to Mr. Gallegos, Plaintiff had denied writing a punch list was his responsibility. ECF 22-11 at 7. Mr. Adams in turn reported Plaintiff's statement to Ms. Clark (Mr. Gallegos' supervisor). Mr.

5

Adams' concern was that Plaintiff intentionally challenged Mr. Gallegos' authority as a new project manager. ECF 22-11 at 7–8.

31. Mr. Blalock was away during the week of November 19, 2018. When he returned on November 26, 2018, he spoke with Defendant about finishing the NIST project. Mr. Adams emailed Mr. Gallegos to inquire about the installers' punch list so that he could compare it with Mr. Blalock's. Mr. Gallegos answered that Plaintiff did not write one. ECF 22-12.

32. On November 28, 2018, Mr. Blalock informed Mr. Adams about issues with Plaintiff during the NIST project. Mr. Blalock complained that Plaintiff had told him to prepare a punch list and directed him to retrieve parts for the re-installation work. ECF 22-9 at 5; ECF 22-11 at 8–9; ECF 22-12 at 6–7. Mr. Adams responded to Mr. Blalock's email with an apology about Plaintiff's conduct. ECF 22-12 at 6–7.

33. Mr. Adams reported Mr. Blalock's complaints to Plaintiff's supervisor, Mr. Anunson. ECF 22-5 at 7; ECF 22-11 at 10–12.

34. Mr. Anunson spoke with Mr. Blalock to obtain more details about Plaintiff's conduct on November 15, 2018. ECF 22-5 at 8; ECF 22-12 at 6.

35. On November 28, 2018, Plaintiff sent Defendant an email containing his punch list from the NIST project. ECF 27-2 at 11.

36. Mr. Anunson discussed with Ms. Kelly the customer's report about Plaintiff's conduct. It was decided to place Plaintiff on administrative leave. ECF 22-4 at 14; ECF 22-5 at 9. On November 28, 2018, Mr. Anunson emailed Plaintiff to inform him that he was "on administrative leave without pay effective immediately while [Defendant looked] into some issues regarding your recent behavior." ECF 22-12 at 9. Mr. Anunson also called Plaintiff; during that conversation, Mr. Anunson did not say Plaintiff was terminated. ECF 22-6 at 17.

37. On November 29, 2018, Mr. Anunson memorialized his conversation with Mr. Blalock in an email to Ms. Kelly and Ms. Clark. ECF 22-12 at 10. His memorialization is consistent with what Mr. Blalock later recalled in his October 29, 2020 declaration. ECF 22-9.

38. Mr. Gallegos first became aware of the NIST matter on November 16, 2018. ECF 22-12 at 2–3; ECF 25-11. Mr. Anunson first spoke with Plaintiff about it on November 28, 2018, but without mentioning NIST specifically. ECF 22-12 at 9; ECF 25-2 at 11–12; ECF 25-3 at 8. Mr. Anunson regards a delay of weeks before informing an employee about an issue as unacceptable. ECF 25-4 at 4.

39. On November 29, 2018, Mr. Anunson called Plaintiff to ask him to come in the next day (November 30) and bring his work equipment with him. ECF 22-5 at 10–11; ECF 22-6 at 24; ECF 25-2 at 20.

40. On those occasions when Defendant requested an employee to return work equipment, termination did not always result. ECF 25-1 at 13; ECF 25-5 at 9. Were his own supervisor to instruct him to bring in his equipment, Mr. Anunson admitted he would feel concerned. ECF 25-4 at 14. The employee handbook's only reference to returning company equipment is made in the context of employment separation. ECF 22-2 at 10.

41. Mr. Anunson did not expressly inform Plaintiff that he was following an H.R. process. Nor did he expressly say that no employment-related decision had been made yet. ECF 25-2 at 14–22.

42. Plaintiff already was recording himself when Mr. Anunson called and, as a result, he recorded the telephone call. ECF 22-6 at 18–19. That recording captured the following:

    a. Plaintiff was planning on turning in his two weeks' notice and resigning.

      b. Mr. Anunson did not say that Plaintiff was fired, terminated, or no longer worked for Defendant.

      c. Plaintiff understood that Mr. Anunson was asking him to come in at noon the next day.

      d. Mr. Anunson asked Plaintiff to "bring all your stuff" or "bring your stuff," in reference to his work equipment, and that "we'll go from there."

*Id*. at 21–24.

    43. The recording continued after the telephone call. It recorded Plaintiff saying that he was going to stay at Defendant only for two more weeks; stating Defendant can "go f\*\*k" itself; and referencing his plan to return the equipment that evening and not see Mr. Anunson, so as not to "give [Defendant] all the pleasure." *Id*. at 25–27. Plaintiff adds that at the time, he was upset and confused. *Id*. at 26–27.

    44. That evening, Plaintiff dropped off his equipment. He texted Mr. Anunson that he did not have the time to see him on November 30, 2021. Nor did Plaintiff go in to see Mr. Anunson on that day as requested. *Id*. at 27–29.

    45. Plaintiff did not attempt or want to reschedule the meeting. *Id*. at 29–30.

    46. Like Plaintiff, Mr. Bryant and Mr. Tostado were installation supervisors. Defendant held them to the same work standards as Plaintiff. ECF 25-3 at 12. Mr. Bryant is white. ECF 22-1.

    47. Ms. Kelly had disciplinary authority over all three. She also had input regarding the discipline imposed against them. ECF 25-1 at 4, 12, 14; ECF 25-9 at 2.

    48. Mr. Tostado was subject of discipline for several incidents in late April and early May 2018. He was abrasive and confrontational in front of a customer. He refused to do work that

one customer requested, and another customer did one of his tasks for him. A customer complained about him. ECF 25-5 at 11; ECF 25-9 at 4.

49. Defendant did not terminate Mr. Tostado. Defendant provided him resources for improving his performance. ECF 25-4 at 17; ECF 25-9 at 5.

50. Plaintiff and Mr. Bryant had the same supervisor, Mr. Anunson. ECF 22-1; ECF 25-4 at 18; ECF 25-10 at 2.

51. Mr. Bryant became confrontational with coworkers and cussed at them. ECF 25-10 at 2. The behavior was unacceptable and unprofessional. ECF 25-10 at 2. Such behavior could result in termination. ECF 25-4 at 16. However, Mr. Bryant was not terminated nor placed on administrative leave. ECF 25-10 at 2.

## LEGAL STANDARD

### I. Fed. R. Civ. P. 56(c)

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976,

979 (10th Cir. 2002).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).

"[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Plaintiff bases his 42 U.S.C. § 2000e (Title VII) discrimination claim on circumstantial rather than direct evidence. Therefore, he proceeds under the framework that *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) created. It requires him to show (1) membership in a protected class, (2) job qualification and satisfactory performance, and (3) an adverse employment action under circumstances giving rise to an inference of discrimination. *Anderson v. Academy Sch. Dist.*,

122 F. App'x 912, 915 (10th Cir. 2004). It is Plaintiff's burden to make that initial *prima facie* showing, but it is not an onerous burden. *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).

Defendant does not contest the first element. It concedes that Plaintiff's race (Hispanic) and national origin (Mexican) are protected traits. However, Defendant disputes whether Plaintiff satisfies the other two elements. Defendant argues that the customer's complaint indicates unsatisfactory job performance, but that complaint also is the reason for the adverse employment action. There is no evidence of unsatisfactory job performance preceding the NIST job incident. Nor is there evidence that Plaintiff was unqualified to work as an installation supervisor. Therefore, for present purposes, the Court assumes that Plaintiff meets the second element.

Also at issue is whether Plaintiff demonstrates the third element, with respect to both the occurrence of an "adverse employment action," and if so, circumstances that permit an inference of discrimination. Defendant argues that Plaintiff did not suffer an adverse employment action; rather, he abandoned his job (by not meeting with Mr. Anunson) before the decision whether to terminate his employment had been made. Plaintiff counters that Mr. Anunson's request to return his work equipment indicated Defendant's intent to fire him. Plaintiff furthers that he already had been placed on administrative leave without pay. Defendant responds that the suspension was only for a few days (from Mr. Anunson's email on November 28 to Defendant's failure to report on November 30), and thus, too short to count as adverse. Defendant relies in part on *Cabral v. Brennan*, 853 F.3d 763, 767 (5th Cir. 2017) in which the employee was placed on a two days' suspension (with the lost pay later reimbursed), which was found to be insufficiently severe. Here, by contrast, Defendant placed no limit on the length of Plaintiff's suspension, and it was instituted in the context of further inquiry into the matter. "Conduct rises to the level of adverse employment action when it constitutes a significant change in employment status, such as hiring, firing, failing

11

to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003). For present purposes, the Court assumes that Plaintiff did experience a change in his employment status that rose above the level of *de minimis* harm and was material in its effect. This Court further assumes the occurrence of an adverse employment action whether respect to being placed on administrative leave, being asked to return his equipment, being asked to come in for a meeting, or otherwise giving Plaintiff the impression that he had been or would be fired.

The final part of the *prima facie* inquiry is whether discrimination can be inferred from the circumstances. Citing *Plotke*, 405 F.3d at 1101, Defendant explains how "a variety of circumstances can give rise to an inference of discrimination, including the decisionmakers' actions or remarks that could be viewed as reflecting a discriminatory animus, the timing or sequence of events leading to a plaintiff's termination, or a plaintiff who is the lone member of a protected class in his workplace." ECF 22 at 18. Defendant points out how there is no evidence of another instance of discrimination and the majority of installation supervisors were members of the same protected class (Hispanic) as Plaintiff.

To establish this *prima facie* element, Plaintiff instead infers discrimination from how Defendant allegedly handled similarly situated, non-Hispanic employees differently. Plaintiff identifies two installation supervisors, Mr. Tostado and Mr. Bryant, who were subject of disciplinary inquiry but received a less severe outcome. This Court finds Plaintiff's showing sufficient, at least for purposes of the initial *prima facie* analysis. Defendant disputes the similarity of Mr. Tostado's and Mr. Bryant's situations. However, consideration of that argument is better left for the third step of the *McDonnell Douglas* analysis. To consider Defendant's argument in its entirety at this first step would risk compressing the full analysis and deprive Plaintiff the

opportunity to argue pretext. *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193–95, n.7 (10th Cir. 2000).

Assuming that Plaintiff does make an initial *prima facie* showing, the second step in the *McDonnell Douglas* framework requires Defendant to offer a legitimate, non-discriminatory reason for its actions. The Court does not ask whether Defendant's reason was:

> wise, fair or correct; the relevant inquiry [instead] is whether the employer honestly believed its reasons and acted in good faith upon them. Even a mistaken belief can be a legitimate, non-pretextual reason for an employment decision.

*Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118–19 (10th Cir. 2007). The Court's consideration is limited to the facts as they appeared to Defendant, without second-guessing its decision, "even if it seems in hindsight that the action taken constituted poor business judgment." *Id*. at 1119. The Court's role is to prevent intentional discrimination in employment practices, "not to act as a super personnel department." *Id*.

Defendant explains that it acted in response to a customer's complaint about Plaintiff. He disregarded the customer's request to install certain office furnishings properly, instructed the customer to retrieve the parts for the re-installation, and asked the customer to prepare the punch list. ECF 22 at 2. Defendant regards what happened as "wholly unacceptable" and below its service standards. *Id*. at 20. Given the understandable importance Defendant places on satisfying customers, its reason for taking an adverse employment action against Plaintiff, even to the extent of firing him, is legitimate. Defendant meets the second step in the analysis.

Summary judgment is warranted unless Plaintiff can show a genuine issue of material fact over whether that reason is pretextual, the third step in the *McDonnell Douglas* framework. *Plotke*, 405 F.3d at 1099. Plaintiff has the burden of producing evidence that would support the inference that Defendant's reason is either a *post hoc* fabrication or otherwise did not actually motivate the

decision. *Id*. at 1102–03. In other words, the Court must determine whether a reasonable jury could disbelieve Defendant. *Riggs*, 497 F.3d at 1119.

One way to show pretext is through "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *DeWitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). However, Plaintiff does not attempt to discredit the factual accuracy of Defendant's reason. He does not dispute that a customer emailed Defendant to complain about his work performance. Nor does he dispute the basic facts of the customer's complaint. Instead, Plaintiff offers explanations for why his conduct was reasonable under the circumstances. He denies knowing why Mr. Blalock created his own punch list (ECF 25-2 at 9), and he explains that Mr. Blalock would have escorted him to retrieve the parts anyway (ECF 25-7 at 3). He also asserts that he had emailed his punch list on November 15, earlier than when Defendant says it received it. ECF 25-2 at 7.

Pretext may be shown in other ways, such as if Defendant treated Plaintiff less favorably than other similarly situated employees. *Riggs*, 497 F.3d at 1120. Plaintiff again relies on Mr. Tostado and Mr. Bryant as comparators in order to show disparate treatment. For this argument, Plaintiff must establish how those two employees are indeed similarly situated to himself. "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance and discipline." *Id*. Plaintiff points out how Ms. Kelly had disciplinary authority over all three installation supervisors. However, he does not show that Ms. Kelly initiated disciplinary matters unilaterally, without the supervisor taking action first. Only Plaintiff and Mr. Bryant had the same supervisor, Mr. Anunson. Mr. Tostado was supervised by

Mr. Wilson. ECF 25-9 at 4. In that respect, Mr. Tostado does not count as a similarly situated comparator. (Nor does the record clearly establish that he is non-Hispanic. ECF 22-1.)

Plaintiff argues that their infractions were of comparable seriousness. He describes his own misconduct as arguing with a customer, refusing to perform work that a customer requested, and requiring the customer to perform an employee's task. "In short," Plaintiff summarizes, "a customer was unhappy with his performance." ECF 25 at 23. However, Mr. Bryant's conduct did not involve a customer, either directly or indirectly. He was disciplined for losing his temper with employees during a series of telephone calls that no customer overheard. ECF 25-10.

Mr. Tostado had a different supervisor, but his misconduct was more similar to Plaintiff's. He left one job before completing it, and he left another without checking with the customer first. On one occasion, his "demeanor was abrasive and confrontational in front of the customer." On another occasion, he told the customer that he was uncomfortable doing a particular task. The customer volunteered to do that task for him, so that he could complete the other tasks. Mr. Tostado was confrontational with a subcontractor. ECF 25-9 at 4. A customer complained to Defendant about him. ECF 25-5 at 11.

Defendant fired neither Mr. Tostado nor Mr. Bryant. Defendant did not place Mr. Bryant on administrative leave. Plaintiff argues that Defendant treated him more harshly in comparison. However, there are substantial differences between their situation and Plaintiff's.

Were the Court nevertheless to accept Plaintiff's argument that Mr. Tostado and Mr. Bryant are similarly situated comparators, then their respective experiences should be considered in full. What Plaintiff omits from his argument is the difference in how they reacted to and participated in the disciplinary process. Both Mr. Tostado and Mr. Bryant gave their sides of the story, and both apologized for what had happened. Plaintiff, by contrast, wholly disengaged, returning his

15

equipment in a way that avoided any contact and not meeting with Mr. Anunson (in addition to telling Mr. Anunson that he already intended to quit). The difference in how the three reacted to the disciplinary process is relevant to the difference in the outcomes.

In addition, Plaintiff omits comparators who suffered similar consequences as he. A plaintiff may not pick and choose comparators, excluding those who were treated equally or less favorably. *English v. Colo. Dep't of Corrs.*, 248 F.3d 1002, 1012 (10th Cir. 2001). Defendant points to Mr. Schafer, a non-Hispanic employee who made racial and religious slurs against a coworker. The misconduct was an internal matter, not involving a customer. However, like Plaintiff, Mr. Schafer was not given a written warning and was asked to return his equipment in advance of any decision on whether to fire him. Unlike Plaintiff, Mr. Schafer did meet with Defendant, following which Defendant decided to end his employment. ECF 22-3 at 7–9. Defendant also refers to two installation supervisors by the last name of Vegas, who like Plaintiff are Hispanic and were supervised by Mr. Anunson. ECF 22-1. Defendant disciplined them for unacceptable work performance (although not involving a customer) in the form of written warnings. ECF 27-4.

No pattern emerges from the comparator evidence that shows Defendant's handling of Plaintiff was harsher than that of other installation supervisors. In other words, no reasonable jury could infer from the evidence that Defendant acted with a discriminatory motive. Consequently, Plaintiff does not show pretext through this evidence.

Next, Plaintiff argues that Mr. Anunson's request to return his work equipment shows that Defendant already had decided to terminate him. However, Plaintiff may not rely on that request in isolation. Mr. Anunson made it in a telephone call after informing him of his suspension without pay. Moreover, Mr. Anunson asked him to bring in his equipment at a specific time (at 12:00 p.m.

the next day) and they would "go from there." Plaintiff emphasizes that Mr. Anunson did not expressly ask for a "meeting." However, he concedes that he still expressed agreement to see Mr. Anunson at the appointed time, and later, he told Mr. Anunson that he could not make it after all. Even if Plaintiff subjectively perceived no express invitation for a meeting, Defendant still may have intended to meet and discuss the matter. Plaintiff leaves open the possibility of a more favorable outcome had he attempted some sort of engagement with Defendant.

Relatedly, Plaintiff argues that Defendant departed from its procedure for handling disciplinary matters. As he describes it, Defendant "generally follows the same disciplinary process which involves starting with a conversation with the employee and/or a written warning, followed by a final written warning and/or termination." ECF 25 at 29–30.[1] Plaintiff cites Defendant's letter to the E.E.O.C. as evidence that Defendant instead terminated him "in any manner" rather than follow that process. In the letter, Defendant asserts a policy to decide whether "to terminate an employee due to unsatisfactory work performance or improper conduct at its discretion." ECF 25-6 at 3. The letter says that it is inadmissible in any subsequent legal proceeding. Nevertheless, even if taken at face value, it does not describe a substantially different process. Both descriptions imply a certain degree of *ad hoc* flexibility. Moreover, Defendant explains in the letter how Plaintiff left without attempting any conversational process.

Plaintiff says that Mr. Tostado and Mr. Bryant were given the opportunity at a conversation and an initial written warning. However, Plaintiff provides no evidence of how that opportunity was communicated to them, such as whether Defendant expressly invited them to a meeting or did so less formally. He provides no evidence that he even attempted to engage in such a process with

---

[1] Plaintiff does not identify what Defendant's procedure is for the specific situation of a customer's formal, written complaint.

Defendant. Plaintiff further alleges that Mr. Anunson did not inform him who the complaining customer was, but neither did he make any attempt to inquire about the reason for his perceived termination.

There is insufficient evidence of a meaningful procedural irregularity that would support the inference that Defendant's reason is pretext. This case does not present the situation in *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1160 (10th Cir. 2008) in which the employer used unusual auditing procedures to show plaintiff's misconduct; it immediately terminated plaintiff rather than follow the progressive discipline given to similarly situated employees; did not interview key witnesses; selectively relied on evidence; and gave plaintiff no benefit of the doubt. In *Trujillo*, the very nature of the procedural departures and the investigation, itself, raised suspicion of pretext.

Plaintiff's final argument is that Defendant's shifting explanation for his termination suggests pretext. He compares Defendant's present claim of job abandonment with the E.E.O.C. letter which speaks in terms of his "termination." Notwithstanding Defendant's express denial of that letter's admissibility in a legal proceeding, its recitation of what "led to his termination" is consistent with the present record. Defendant concluded the letter by recalling how, "[u]pon receiving a customer complaint regarding [Plaintiff, it] suspended him so that it could undertake an investigation. Rather than participating in the investigation and meeting with his supervisor, [Plaintiff] chose to skip the meeting and drop off his tools." The letter's reference to Plaintiff's "termination" is not materially inconsistent with its present argument. Moreover, Plaintiff points to no other inconsistencies in Defendant's description of how his employment came to an end—or in the reason why. Plaintiff does not show the kind of substantive inconsistency that *Paup v. Gear Prods., Inc.*, 327 F. App'x 100, 113–14 (10th Cir. 2009) mentioned, such as when an

employer and its representatives give differing explanations for the employee's termination or the reason the employer tells the employee differs from what the employer tells the court.

## **CONCLUSION**

The issue dispositive to Plaintiff's 42 U.S.C. § 2000e (Title VII) claim is whether he can show Defendant's actions were pretext for discrimination. Ultimately, it is Plaintiff's burden of production, and to survive summary judgment, he must produce sufficient evidence that would permit such an inference. He points to certain differences and irregularities, but whether considered in isolation or together, they provide an insufficient basis by which to call Defendant's explanation into doubt. Therefore, summary judgment is warranted on that claim. Plaintiff also produces insufficient evidence from which a reasonable jury could find that the adverse employment action would not have occurred but for discrimination. Therefore, summary judgment also is warranted on his 42 U.S.C. § 1981 claim. *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S.Ct. 1009, 1014 (2020) (holding that "a plaintiff bears the burden of showing that race was a but-for cause of its injury").

Accordingly, the Court **grants** Defendant's Motion for Summary Judgment [filed January 29, 2021; ECF 22].

Entered this 26th day of March, 2021, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge